**UNITED STATES of America, Appellee,**

v.

**William Roy NORDSTROM, Appellant.**

**No. 83–1888.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 15, 1984.

Decided March 30, 1984.

Rehearing and Rehearing En Banc Denied May 7, 1984.

Meshbesher, Singer & Spence, Ltd., Ronald I. Meshbesher, Carol Grant, Minneapolis, Minn., for appellant.

James M. Rosenbaum, U.S. Atty., Richard E. Vosepka, Asst. U.S. Atty., Dist. of Minn., Minneapolis, Minn., for appellee, Allen R. Brey, Legal Intern.

Before BRIGHT, ARNOLD and FAGG, Circuit Judges.

BRIGHT, Circuit Judge.

William Roy Nordstrom appeals from his conviction for aiding or assisting the escape of a federal prisoner in violation of 18 U.S.C. § 752(a). Nordstrom at trial admitted that he assisted prisoner David Medin in leaving the Federal Correctional Institution at Sandstone, Minnesota, but claimed that he did not know that Medin's departure from Sandstone was unauthorized. Having examined the record of the proceedings in the district court,[1] we conclude

---

**1.** The Honorable Robert G. Renner, United States District Judge for the District of Minnesota.

that the jury received proper instructions, and that the evidence is sufficient to support the verdict. Therefore we affirm the conviction.

Nordstrom, a lawyer and friend of Medin's, testified that on December 3, 1982, he drove to the Sandstone facility, met Medin at a pre-arranged place on the facility's grounds, supplied Medin with a change of clothes and $1,000 cash, and drove him to a motel in Eau Claire, Wisconsin, where the two parted company. Nordstrom asserted, however, that he believed at the time that Medin was authorized to leave Sandstone to make his way to Washington, D.C., either to confer with the FBI about undercover activities or to testify before a congressional committee investigating FBI misconduct. On appeal, Nordstrom contends that the trial judge improperly instructed the jury on proof of criminal intent, and that the evidence does not suffice to establish his criminal intent beyond a reasonable doubt.

█ On our review of the record, we must reject these contentions. The trial judge gave the jury fair and proper instructions. Nordstrom objects to the following paragraph of the instruction on intent:

> The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact.

Nordstrom argues that this instruction permitted the jury to find that he acted with criminal intent even if it also found that he genuinely believed himself to be acting lawfully. Other portions of the instruction on intent, read just before and after the portion to which Nordstrom objects, however, make it clear that to convict Nordstrom the jury would have to find beyond a reasona-

ble doubt that he actually knew Medin was escaping. The judge told the jury:

> Here, then, actual knowledge that David Medin was escaping from Sandstone Correctional Institution on or about December 3, 1982 is an essential element of the offense charged. You may not find the defendant guilty unless you find beyond a reasonable doubt that he knew David Medin was escaping without the permission of the authorities. It is not sufficient to show that the defendant may have suspected or thought that Mr. Medin was such an escapee.
>
> \*     \*     \*     \*     \*     \*
>
> It is entirely up to you as to whether you find any deliberate closing of the eyes, and the inferences to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.

These instructions on intent, taken as a whole, would not lead a jury to believe it could convict Nordstrom even if it determined that Nordstrom genuinely believed Medin's departure from Sandstone to be authorized and lawful. *Cf. United States v. Kershman*, 555 F.2d 198, 199–201 (8th Cir.) (upholding pharmacist's conviction of knowing and intentional distribution of a controlled substance, pursuant to similar instructions on intent and conscious avoidance of knowledge, where pharmacist claimed he did not know that prescriptions he filled had not been issued for a legitimate medical purpose), *cert. denied*, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977).

█ Nor do we believe the evidence insufficient to support the verdict. Though Medin himself testified that he represented to Nordstrom that the departure from Sandstone was authorized, the jury may have rejected Nordstrom's testimony that he believed Medin. Given the highly irregular and suspicious circumstances of Medin's departure from Sandstone [2] and the

---

**2.** Medin had Nordstrom meet him on December 3 in a garage in the officials' residence section

of the Sandstone facility, outside the secured prison area. To reach this meeting place, Nord-

uncontested fact of Medin's journey from Sandstone to Eau Claire as Nordstrom's passenger, we think the jury had sufficient grounds to find Nordstrom guilty even in the face of Nordstrom's professions of ignorance.

Indeed, the central issue in the case is the credibility of Nordstrom's claim that he did not know Medin lacked authority to leave the prison. The district judge who heard the evidence refused to interfere with the jury's verdict. Unlike the jury and the district judge, we have neither heard nor seen the witnesses testify. We are not in a position, on this record, to characterize the verdict as one based on insufficient evidence.

Accordingly, we are obliged to affirm the conviction.

---

strom had to drive past several signs that read "authorized personnel only." On each of his previous visits to Medin at Sandstone, Nordstrom had to go through elaborate security, and met Medin in the visitation area inside the prison.

When Medin got into Nordstrom's car, he changed into the clothes Nordstrom had brought for him. He turned off the car radio. He instructed Nordstrom to take him to Eau Claire, even though Nordstrom testified Medin had earlier told him he would be flying to Washington from either Minneapolis or Duluth (the two cities closest to Sandstone). En route to Eau Claire, Nordstrom called his wife in suburban Minneapolis and told her he would be late because he had to make a trip to Rochester (not Eau Claire, Sandstone, or Duluth). He left Medin alone in Eau Claire, though Medin's purported contact had not shown up at the putative meeting place there.

Before the December 3 episode, Nordstrom obtained clothes for Medin from Medin's sister, who testified that she told Nordstrom then that

the story about Medin's authorization to leave prison and travel to Washington unescorted sounded dubious. She asked Nordstrom whether he had seen Medin's plane tickets or checked with prison authorities or the FBI about Medin's authorization to leave Sandstone. Nordstrom admits that he never sought to corroborate Medin's authorization with the officials, and never saw or asked to see the plane ticket (which in fact did not exist). Nor did Nordstrom hesitate to withdraw $1,000 from his own bank account to give to Medin, supposedly to cover Medin's expenses in travelling to Washington to confer with or testify before federal officials.

Moreover, Nordstrom's several statements to authorities at various times during the investigation conflict with each other, and with the testimony he gave at trial.

In light of all these irregularities, we cannot hold that the jury had insufficient grounds for disbelieving Nordstrom's testimony that he did not know Medin's departure from Sandstone was unauthorized.